167 P.3d 575 (2007)
STATE of Washington, Respondent/Cross-Appellant,
v.
Jeffrey R. McKEE, Appellant/Cross-Respondent.
No. 56504-4-I.
Court of Appeals of Washington, Division One.
July 23, 2007.
Publication Ordered September 14, 2007.
*577 Dana M. Lind, Nielsen Broman & Koch PLLC, Attorney at Law, Seattle, WA, for Appellant/Cross-Respondent.
Jeffrey McKee/Doc # 882819 (Appearing Pro Se).
Prosecuting Atty. King County, King. Co. Pros./App. Unit Supervisor, Patrick C. Cook, The Walthew Law Firm, Andrea Ruth Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent/Cross-Appellant.
BAKER, J.
¶ 1 Jeffrey McKee was convicted of two counts of first degree rape while armed with a firearm. The trial court, noting that the victims were prostitutes, imposed an exceptional minimum sentence. McKee challenges the sufficiency of the evidence on one of the firearm enhancements and one of the rape convictions, as well as community custody provisions barring him from using pornography or alcohol. The State cross-appeals the exceptional minimum sentence. We affirm *578 McKee's convictions and remand to the trial court to revise sentencing errors.

I.
¶ 2 On June 4, 2003, Jearlean Bradford contacted King County Sheriff's Detective Sue Peters. Peters was acquainted with Bradford through her work with the Highway Intelligence Team (HITS), a group of officers who work to document and establish rapport with prostitutes working the area around Pacific Highway South between SeaTac and Shoreline. Bradford said that she was sitting at a bus stop when a white male in a clean, red pickup truck pulled over and offered to give her a ride and some beer money. Bradford accepted. Eventually Bradford agreed to perform oral sex for $30. Bradford said that the man drove her to an area near a park, then suddenly grabbed her head, forced it toward his exposed penis, and ordered her to "suck his dick." Bradford said that when the man saw her "brothers" approaching, he pushed her out of the truck and drove away. Bradford provided a detailed description of the suspect and said that he was driving a red truck with Harley-Davidson floor mats and license plate number A98146J. The truck was registered to Jeffrey McKee.
¶ 3 On June 5, 2003, Detective Peters was contacted by Lynae Korbut, whom Peters also knew through the HITS program. Korbut said that two nights earlier she was walking on Kent-Des Moines road near Pacific Highway South when a clean-cut white male in a red pickup truck pulled over and asked if she needed a ride. Korbut said she did not plan to proposition the man for sex because she thought he was an undercover police officer, but she accepted his offer of a ride. He drove her to a convenience store, where he bought her a wine cooler and a pack of cigarettes. Korbut said that after they left the store, she tried to give the man directions to where she wanted to go, but instead he drove to a dead-end road, exposed his penis, put a gun to her head, and ordered her to "suck my dick, bitch." Korbut said that after he forced her to perform oral sex at gunpoint, he ordered her to undress and then raped her vaginally and anally from behind. Korbut said that when he was finished, he threw her clothes out of the truck and left her naked in the street. She described her attacker in detail and said his red truck had Harley-Davidson floor mats and a license plate number beginning with "A."
¶ 4 On June 18, 2003, Jamie Lee Ray reported to police that she had been raped a couple of weeks earlier by a clean-cut white male with short blondish-brown hair and a medium build. Ray said that she and her friend Muna Absiya were walking near Pacific Highway South when a man in a red truck pulled up and offered her a ride. Absiya recognized him as a man who had previously picked her up in his red truck and raped her orally and vaginally before she managed to escape. Absiya warned Ray not to get in the truck, but she did anyway. Ray said that the man drove to the parking lot of a daycare center, grabbed her by the hair, put a small black handgun to her head and said "suck my dick, bitch." After forcing her to perform oral sex, he ordered her to undress and raped her vaginally and anally at gunpoint. Ray said that when he was finished, he threw her and her clothes out of the truck and drove away.
¶ 5 Jeffrey McKee was arrested and charged with four crimes: count I, first degree rape of Lynae Korbut while armed with a firearm; count II, attempted second degree rape of Jearlean Bradford; count III, second degree rape of Muna Absiya; and count IV, first degree rape of Jamie Lee Ray while armed with a firearm. After McKee was arrested, Bradford was unable to select him from a lineup, but said McKee "would be perfect if he lost 40 or 50 pounds." Bradford did, however, identify McKee in court as the rapist. Korbut identified McKee in a photomontage, in a lineup, and in court. Absiya identified him in a lineup and in court as the man who had raped her and had picked up Ray. Absiya also identified photographs of the truck, noting the Harley-Davidson floor mats. Ray was unable to pick out McKee in a photomontage or lineup, nor could she identify him in court. However, she identified photos of McKee's truck, noting the seat covers and Harley-Davidson floor mats, and testified that McKee's gun looked like the *579 one that was held to her head during the rape.
¶ 6 Jennifer Gauthier of the Washington State Patrol Crime Laboratory identified three DNA profiles in a semen stain on McKee's truck seat cover that were consistent with a mixture of genetic material from Ray, McKee, and an unknown female. Gauthier conservatively estimated that one in 9,400 individuals could potentially have contributed the DNA consistent with Ray's profile, but was confident that Ray's DNA was contained within the semen stain.
¶ 7 The trial court instructed the jury that evidence on each count was cross-admissible for the purposes of proving a common scheme or plan. The jury found McKee guilty as charged on counts I and IV, both with firearm enhancements, but not guilty on counts II and III.
¶ 8 McKee requested an exceptional minimum sentence below the standard range, arguing that the multiple offense policy of the Sentencing Reform Act of 1981[1] (SRA) resulted in a clearly excessive sentence. Noting that the victims were prostitutes who were willing to have sex for money, the trial court granted McKee's request and ordered that the minimum base sentences for each of the rapes be served concurrently rather than consecutively. The trial court also imposed conditions of community custody, including restrictions on alcohol and pornography. McKee appealed, and the State cross-appealed the exceptional minimum sentence.

II.
¶ 9 McKee argues that the evidence is insufficient to support his firearm enhancement for first degree rape of Lynae Korbut and his conviction for rape of Jamie Lee Ray. Evidence is sufficient to sustain a jury's verdict on a conviction or enhancement if, when viewed in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] A defendant who challenges the sufficiency of the evidence admits the truth of the evidence and all rational inferences that may be drawn from it.[3] All reasonable inferences must be drawn in favor of the State and against the defendant.[4] The reviewing court must defer to the jury's determination as to the weight and credibility of the evidence and its resolution of conflicting testimony.[5] For purposes of a firearm enhancement, the State must prove that the defendant was armed during commission of the crime with a "firearm," defined as a weapon "from which a projectile or projectiles may be fired by an explosive such as gunpowder."[6] The State need not introduce the actual deadly weapon at trial; witness testimony alone may provide sufficient evidence.[7]
¶ 10 McKee argues that the evidence is insufficient to support the firearm enhancement because Korbut was unable to provide a detailed description of the gun at trial and because the only real gun accessible to McKee  the black semiautomatic recovered from his bedroom  did not match Korbut's initial description. Therefore, according to McKee, there is no evidence that the gun recovered from his residence was the actual weapon purportedly used against Korbut.
¶ 11 The record shows that Korbut initially told Detective Peters that the gun was chrome and looked like a .38 Special, which is a revolver. However, at trial, Korbut testified that although she was not able to see the make of the gun, she saw "this steel part of it." She said she knew the gun was real because of the weight and feel of the steel, and testified that she did not bite McKee's *580 penis during the rape because of the gun to her head. On cross-examination, when challenged regarding her description of the gun, Korbut testified that she knew it was a real gun because McKee was holding it like a real gun and because of the texture of steel against her head. She acknowledged that she previously said she saw chrome, but explained that although she "might have seen something shiny," she could not give a specific description of the gun. When asked whether she saw a gun, Korbut said, "I saw a peripheral something to my head" and reiterated that it felt like a gun and was a gun because she would have bit McKee if it was not.
¶ 12 We hold that there is sufficient circumstantial evidence, viewed in the light most favorable to the State, from which a rational trier of fact could conclude beyond a reasonable doubt that McKee was armed with a real gun when he raped Korbut. Korbut's testimony regarding the weight and feel of the gun, seeing a "peripheral something to my head" and the way in which McKee wielded it, combined with evidence that McKee had a real gun and had access to other guns, provided the jury with sufficient evidence to support the firearm enhancement. Although McKee questions the credibility of Korbut's conflicting testimony, these are matters for the jury to decide.
¶ 13 McKee also argues that the evidence is insufficient to support his conviction for first degree rape of Jamie Lee Ray. He notes that Ray was unable to identify McKee in a photomontage, at the lineup, or in court, and contends that Ray's descriptions of her attacker and his truck was inconsistent with the actual appearance of McKee and his truck. He points to evidence showing that another white man in a red truck was raping prostitutes in the same area and argues that the DNA evidence was inconclusive.
¶ 14 We reject these claims. Ray described her attacker as a clean-cut white male with short blondish-brown hair and a medium build, and positively identified his truck, including the Harley-Davidson floor mats. Her description of the gun used in the rape was also consistent with the gun recovered from McKee's bedroom. Muna Absiya positively identified McKee in a lineup and in court as the man who picked up Ray. Absiya also identified photos of McKee's truck. This evidence, combined with Gauthier's testimony that she was confident that the semen stain in McKee's truck contained Ray's DNA, is more than sufficient to sustain the conviction.
¶ 15 We next evaluate the State's cross-appeal challenging the trial court's decision to impose an exceptional minimum sentence below the standard range. Appellate review of an exceptional sentence is a three-step process governed by RCW 9.94A.585. First, we determine whether the record supports the reasons given by the trial court for imposing the exceptional sentence. This is a factual inquiry reviewed under the "clearly erroneous" standard. Second, we determine whether the trial court's reasons are sufficiently substantial and compelling to justify an exceptional sentence as a matter of law under a de novo standard of review. Third, we determine whether the exceptional sentence is clearly too excessive or lenient under the abuse of discretion standard.[8]
¶ 16 The State first argues that the trial court abused its discretion by granting an exceptional minimum sentence based on application of the multiple offense policy as a mitigating factor. RCW 9.94A.535(1)(g) permits the trial court to impose a sentence below the standard range when the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is "clearly excessive" in light of the purposes of the SRA. A sentence is clearly excessive "if the difference between the effects of the first criminal act and the cumulative effects of the subsequent criminal acts is nonexistent, trivial, or trifling."[9] McKee does not respond substantively to the State's briefing on this point. Instead, he argues that the trial court's decision was not based primarily on the multiple offense policy, but rather because RCW 9.94A.535 permits the court to depart from *581 the standard felony sentencing range if it finds "substantial and compelling" reasons to justify the exceptional sentence and enters appropriate findings of fact and conclusions of law.
¶ 17 We agree that the multiple offense policy cannot serve as a mitigating factor in a case involving two first degree rapes committed at different times against different women, each of whom was raped at gunpoint orally, vaginally, and anally. Nor do we find any other valid basis to support an exceptional minimum sentence in this case.
¶ 18 The record does not support the trial court's reasons for imposing the exceptional sentence. The State does not dispute the trial court's finding that Korbut and Ray willingly entered McKee's truck for the purpose of engaging in prostitution or some other illegal activity. However, contrary to McKee's argument, these facts do not provide support for the trial court's finding that "the presumptive sentence for Jeffrey McKee is far in excess of the top of the range for crimes that are even more brutal than the crimes committed by McKee." This is not a factual finding, but rather a reflection of the trial court's personal opinion and subjective belief that raping a prostitute is not as brutal as raping a woman who "did not willingly start off ready to perform a sex act." Thus, it is clearly erroneous.
¶ 19 We also reject McKee's claim that the trial court's reasons for imposing the sentence were substantial and compelling because his crimes were more like robbery than rape, and because prostitutes are not as traumatized by rape as other victims are. The court's conclusions of law stated that "[o]peration of the multiple offense policy of RCW 9.94A.589 . . . results in a presumptive sentence that is clearly excessive" because they "were initiators and/or willing participants in the illicit circumstances, or precursor offenses, leading to their rapes." At sentencing, the court explained that the sexual relations were against the victims' will only in the sense that they did not get paid, and that prostitutes are a "far cry from the innocent rape victim" the Legislature envisioned when enacting the very severe penalties for this crime. We disagree. The fact that Korbut and Ray may have been willing to have sex for money does not trivialize the trauma of being raped at gunpoint orally, vaginally, and anally. Such crimes are extremely egregious no matter whom they are perpetrated against. Korbut and Ray were in no sense willing participants in these acts. Accordingly, we hold that the trial court abused its discretion in imposing a sentence that was too lenient under the circumstances, and we remand to the trial court for resentencing within the standard range.
¶ 20 We next consider McKee's challenges to certain conditions of community custody. McKee argues that the trial court acted outside its statutory authority in requiring that he not purchase or possess alcohol and that he participate in a substance abuse treatment evaluation and follow recommended treatment. The State concedes error because these conditions are not reasonably related to the circumstances of McKee's alleged offenses. We accept the State's concession of error on this point.
¶ 21 McKee also argues that the community custody provision barring him from possessing or perusing "pornographic materials" is unconstitutionally vague and overbroad. The State initially conceded vagueness under State v. Sansone.[10] In that case, the offender was subject to the condition that he not possess pornography except as permitted by his therapist or Community Corrections Officer. While on community placement, he was discovered to be in possession of photographs of scantily-clad women. The trial court found him to be in violation of the condition and sentenced him to additional confinement. On appeal, we invalidated the provision as unconstitutionally vague because it was insufficient to provide the offender with fair notice of what materials could result in a violation, and we remanded to the sentencing court for imposition of a condition containing the necessary specificity.[11]
*582 ¶ 22 However, pursuant to RAP 10.8, the State subsequently filed a statement of additional authorities citing our recent decision in State v. Bahl.[12] In that case, the offender argued that community custody provisions concerning "erotic material" and "sexual stimulus material" were unconstitutionally vague and overbroad, and the State had conceded error under Sansone. We noted that in analyzing a vagueness challenge, the first step is to determine whether to review the rule on its face or as applied.[13] Vagueness challenges that do not involve First Amendment rights are to be judged not facially, but as applied in light of the facts of each case.[14] The offender had presented no actual conduct or factual record to review; rather, he "merely anticipates that he might be accused of engaging in conduct that violates the sentencing conditions."[15] Thus, we rejected the State's concession of error because, unlike Sansone, the term had not yet been applied and there was no factual record to evaluate.[16] We further noted that one of the authorities relied on in Sansone was United States v. Loy,[17] in which the federal court concluded that it was appropriate to reach the merits of an offender's pre-enforcement challenge and determined that a prohibition against possessing pornography was unconstitutionally overbroad.[18] We stated that:
While we have followed Loy in concluding that a prohibition against possessing "pornography" is too vague as applied to possession of the photographs in Sansone, we have not yet agreed it is appropriate to evaluate conditions of sentence for vagueness in a pre-enforcement challenge. We are not inclined to do so in the absence of briefing on the pros and cons of that approach. We have reservations about the wisdom of making the appellate courts routinely available as editors to demand that trial courts rewrite sentencing conditions to avoid hypothetical problems.[[19]]
Accordingly, "[b]ecause Bahl has not explained why his vagueness challenge requires evaluation of the conditions in a factual vacuum," we declined to review it.[20]
¶ 23 In this case, McKee argues that the pornography condition is vague as applied because he was never alleged to have possessed or accessed pornography and it was not a factor in his offense; therefore, he has no way of knowing whether something he accesses will be deemed "pornography." McKee is correct that the condition should be evaluated as applied, but he cannot escape the fact that he is attempting to mount a pre-enforcement challenge with no factual record to evaluate. Thus, following Bahl, we reject the State's concession of error and decline to address the issue directly. However, because we have already decided to remand to the trial court to correct the sentencing errors discussed above, the vagueness problem may be raised on remand so as to obtain a description of "pornographic materials" with sufficient specificity to provide McKee with fair notice of what types of materials would constitute a violation.
¶ 24 McKee also argues that the pornography conditions were overbroad in violation of his right to free speech. However, an offender's constitutional rights during community placement are subject to SRA-authorized infringements, including crime-related prohibitions.[21] Because the pornography restrictions in McKee's case are crime-related conditions of community custody, we reject his overbreadth challenge.
*583 ¶ 25 McKee, acting pro se, filed a statement of additional grounds for review (SAG) raising six additional issues not addressed by defense counsel. The State did not respond. None of McKee's arguments have merit.
¶ 26 First, McKee argues that the State of Washington and Department of Corrections denied him due process and access to the courts by transferring him to a private prison in another state against his will and without a hearing, where he was unable to timely or efficiently prepare his SAG because he lacked sufficient access to legal materials. However, the Department of Corrections is not required to provide a pre-transfer hearing.[22] Moreover, McKee asked for and received several extensions of time to file his SAG.
¶ 27 Second, McKee argues that the trial court erred in allowing testimony from his ex-wife regarding McKee's vasectomy, in violation of the spousal communications privilege in RCW 5.60.060. However, the privilege is waived where the communications are not confidential.[23] The trial court ruled that this testimony was not confidential because McKee's ex-wife indicated that the vasectomy was openly discussed outside the marriage. Thus, there was no error.
¶ 28 Third, McKee argues that the live lineup and photomontage identifications were impermissibly suggestive in many ways and that the evidence should have been suppressed. An out of court identification is admissible unless the procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[24] The record does not support McKee's claims.
¶ 29 Fourth, McKee argues that the charges should have been severed and tried separately because of prejudicial similarities to the Green River Killer case and because it made the case more complicated and confusing. Joinder is appropriate when the offenses (1) are of the same or similar character, even if not part of a single scheme or plan; and (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.[25] "Severance is only proper when the defendant carries the difficult burden of demonstrating undue prejudice from a joint trial."[26] McKee has not met this burden. The jury heard no references to the Green River Killer, and the four counts were highly interconnected.
¶ 30 Fifth, McKee argues that photos of his bedroom showing knives and toy guns, as well a photo of his girlfriend's gun, should not have been admitted because they were impermissibly suggestive and irrelevant. But McKee has not shown any prejudice. McKee also claims that the police should not have seized the real gun found in his bedroom nor emails from his computer because those items were outside the scope of the search warrant. A search warrant meets constitutional requirements if it describes the things to be seized with reasonable particularity under the circumstances.[27] This requirement was satisfied.
¶ 31 Sixth, McKee alleges cumulative error. Because McKee has shown no error, this argument fails as well.
¶ 32 In conclusion, we uphold McKee's convictions and remand to the trial court for resentencing consistent with this opinion.
¶ 33 Affirmed and remanded with instructions.
WE CONCUR: DWYER and BECKER, JJ.
NOTES
[1] Ch. 9.94A RCW.
[2] State v. Joy, 121 Wash.2d 333, 338, 851 P.2d 654 (1993).
[3] State v. Thomas, 150 Wash.2d 821, 874, 83 P.3d 970 (2004).
[4] State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992).
[5] Thomas, 150 Wash.2d at 874-75, 83 P.3d 970.
[6] RCW 9.41.010.
[7] State v. Bowman, 36 Wash.App. 798, 803, 678 P.2d 1273 (1984); State v. Goforth, 33 Wash.App. 405, 412, 655 P.2d 714 (1982).
[8] State v. Fowler, 145 Wash.2d 400, 405-06, 38 P.3d 335 (2002).
[9] State v. Hortman, 76 Wash.App. 454, 463-64, 886 P.2d 234 (1994).
[10] 127 Wash.App. 630, 111 P.3d 1251 (2005).
[11] Sansone, 127 Wash.App. at 643, 111 P.3d 1251.
[12] 137 Wash.App. 709, 159 P.3d 416 (2007).
[13] Bahl, 137 Wash.App. at 716, 159 P.3d 416 (citing City of Spokane v. Douglass, 115 Wash.2d 171, 181-82, 795 P.2d 693 (1990)).
[14] Bahl, 137 Wash.App. at 716, 159 P.3d 416 (citing Douglass, 115 Wash.2d at 182, 795 P.2d 693).
[15] Bahl, 137 Wash.App. at 716, 159 P.3d 416.
[16] Bahl, 137 Wash.App. at 717, 159 P.3d 416.
[17] 237 F.3d 251, 266-67 (3rd Cir.Pa.2001).
[18] Loy, 237 F.3d at 266-67.
[19] Bahl, 137 Wash.App. at 718, 159 P.3d 416.
[20] Bahl, 137 Wash.App. at 719, 159 P.3d 416. See also State v. Johnson, No. 56786-1-I, 2007 WL 740961, 2007 Wash.App. LEXIS 443 (March 12, 2007) (reaching the same conclusion under similar circumstances).
[21] Bahl, 137 Wash.App. at 714-15, 159 P.3d 416.
[22] In re Pers. Restraint of Matteson, 142 Wash.2d 298, 315, 12 P.3d 585 (2000).
[23] Swearingen v. Vik, 51 Wash.2d 843, 848, 322 P.2d 876 (1958).
[24] Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).
[25] CrR 4.3(a).
[26] State v. Alsup, 75 Wash.App. 128, 131, 876 P.2d 935 (1994).
[27] State v. Dodson, 110 Wash.App. 112, 120, 39 P.3d 324 (2002).