# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49381-1-II |
| Respondent, | |
| v. | |
| TERI MICHAEL TALBOT, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Teri Michael Talbot appeals his conviction for attempted second degree child molestation and sentence imposing community custody conditions. Talbot argues that (1) there was insufficient evidence to show that he (a) intended to have sexual contact, and (b) took a substantial step towards committing the crime; and (2) the sentencing court improperly imposed community custody conditions that prohibited him from possessing any devices with internet access and from accessing the internet without permission. We affirm.

## FACTS

### A.   THE UNDERCOVER OPERATION

On September 18, 2015, the Vancouver Police Department initiated an undercover operation to "to identify subjects that had a sexual interest in children" and "who would take steps towards fulfilling or acting on those desires." 2 Verbatim Report of Proceedings (VRP) at 113-14. Detective Robert Givens posted an online ad stating, "Single Mom looking for discreet friend

for daughter. no role playing. hopeful for someone kind and gentle she can learn from." Clerk's Papers (CP) at 18. Detective Givens initially acted as the mom, Ellie O'Reilly.[1]

B.      THE COMMUNICATIONS

On September 18, Talbot responded to the online ad. Talbot was 59 years old when he responded to the online ad. He stated, "Hi I saw your post is this for real if so I would love to teach her anything she wants." CP at 109. Ellie responded by saying that she was looking for "someone gentle and patient" and that her daughter was "very young and inexperienced, but a very pretty little girl." CP at 109. Ellie then asked if Talbot was still interested and he said that he was "very gentle and not in a hurry . . . I am older and can take my time with her and can maybe help her in other ways. $." CP at 110.

On September 21, Ellie messaged Talbot and said, "She is very young. is that something you are comfortable with?" CP at 110. Talbot said, "Yes I am interested." CP at 110. Talbot later asked to meet Ellie " and talk then [they could] go from there." CP at 111. Ellie said she would like to meet in person, but wanted to get to know Talbot better first.

Ellie then asked Talbot what he would do so she would know he is gentle. Ellie said, "My girl will be 13 in December, so it will take a very patient man." CP at 111. Talbot responded by saying, "Well I would have to know what it is you are looking for. I would rather talk in person not here on the net. Give me an idea of what you want." CP at 111. And he said that he understood Ellie wanted to get to know him better before agreeing to meet, that he "could get in trouble for this," and that he had to protect himself too. CP at 112.

---

[1] Ellie O'Reilly is a fictitious person, but for the purposes of clarity, this opinion will refer to any law enforcement officer posing as Ellie O'Reilly as Ellie.

Ellie then asked Talbot if he had done this before. Talbot said no, and said, "May I ask why start at this age?" CP at 112. Ellie stated that her daughter had asked her about sex, had been watching pornography, and had been engaging in sex chats with boys. Talbot then said that he would still like to meet Ellie, "sit down and talk and if it is OK then we can go from there." CP at 113.

On September 22, Ellie messaged Talbot and asked him what his plan was to give her daughter "a good and gentle experience." CP at 118. Talbot responded that he "really [didn't] want to say anything on hear [sic] I would rather speak in private. If someone else saw the [sic] we both would be in big trouble so I want to meet and talk" in public. CP at 119. Ellie proposed using cell phones. She also said, "i just want to be very clear. u do understand this is about my daughter and not me right?" CP at 119. Talbot responded by saying they should meet for coffee, should be comfortable with each other first, and that he understood it was about the daughter, but "what if I am interested in [you too]." CP at 119. Ellie said that "this is only about her rite now. this is for my girl, not me. i hope u understand." CP at 120. Talbot said he understood it was only about the daughter and that "if we can get together I would be able to give her a wonderful experience gentle and pleasurable." CP at 120.

Ellie then asked about Talbot's plan regarding protection. Talbot stated that he "was fixed years ago I can't make baby's [sic] anymore." CP at 120. Talbot then became suspicious and asked Ellie if she worked for "2020 [sic]." CP at 120. Ellie assured Talbot that she did not work for 20/20 and asked Talbot if he was a cop. Talbot said no and asked, "So how would you like to go forward?" CP at 120.

3

Ellie proposed taking her daughter out of school, meeting with Talbot first, and then if everything was okay, go back to her home and meet her daughter. Talbot said, "I will do this but I want to meet you first." CP at 120. Ellie agreed and said, "[W]e can meet somewhere first and if either of us dont feel 100% ok, we can just walk away." CP at 120. Talbot agreed and said Ellie could come to his place or they could meet somewhere else.

On September 24, Ellie messaged Talbot and he asked her what she had planned. Ellie asked Talbot if he was still interested in helping them out and Talbot said, "Yes but we do have to meet and talk." CP at 121. Ellie then asked if Talbot was willing to go right back to her apartment after they met and talked. Talbot said, "Yes if everything is fine let's talk first." CP at 121. Ellie asked Talbot, "i think we established that she is staying home from soccer to start lessons with u rite?" CP at 121. She then asked Talbot if he could pick up some lubrication. Talbot responded, "Can you pick it up . . . Or we can do it on the way back to your place." CP at 121. Ellie also asked, "[A]re you going to be ok to starting tonite?" CP at 121. Talbot responded, "If everything is OK yes . . . Let her go [to soccer and] we can do this when she gets home." CP at 121.

Later that day, Ellie called Talbot and asked to meet at a coffee shop.[2] Ellie and Talbot agreed to meet at a coffee shop at 4:00 PM.

During this conversation, Talbot said he had "never been with a child" and,

> I thought when I read the ad it was a mother and daughter of age and they were wantin', you know, and then when you came up with that I'm going well okay wait a minute. How - what - huh? What? Okay? Yeah well that's every guy's ultimate fantasy, you know, and you know, I'm just going - I - I - I just have to be sure.

---

[2] Investigator Maggi Holbrook acted as Ellie over the phone.

4

CP at 127-28. When Ellie mentioned that she did not want her daughter to be afraid of sex or afraid of men, Talbot responded:

> And I would and I would also if you remember your first time for two or three days after, you walked bow legged and sore and swollen. I would not want that for her. It would be very slow and easy and it wouldn't be the very first time that everything happened. It would be gradual so that the active penetration doesn't wear her raw and make her sore. She would be used to it, um, this isn't just a one-time shot – bam deal.

CP at 129. He also stated that the "first time it would be sitting and talking and feeling and touching and exploring" and "a little, you know, little licking and sucking." CP at 137.

Talbot also asked Ellie if there was a possibility for him and her "further down the line." CP at 134. Ellie reminded Talbot that it was about her daughter and that it would be too weird to be with someone who had been with her daughter. Ellie then raised the issue of condoms. Talbot said he was not willing to use a condom. Ellie again asked Talbot to bring some lubricant with him because even touching and exploring can get her daughter "raw." CP at 137.

Just after 4:00 PM, Talbot entered the coffee shop, looked around, and walked outside. Talbot was then arrested. He did not have any physical evidence on him.

On September 28, Talbot was charged with attempted second degree child rape. On June 8, 2016, the information was amended to include attempted second degree child molestation.

C.    TRIAL

On June 8, a bench trial was held.[3] The online ad, the messages, and phone call between Talbot and Ellie were admitted into evidence.

---

[3] Talbot waived his right to a jury trial.

1.    Testimony of Detective Givens

At trial, Detective Givens testified to his posting of the online ad, his interactions as Ellie with Talbot during the messaging part of the undercover operation, and Talbot's eventual arrest. Talbot never asked to meet the daughter prior to a meeting with Ellie. The agreement between Talbot and Ellie was to meet first, and be sure or walk away. The tone and wording of the messages made it clear that the objective of the meeting between Talbot and Ellie was for Talbot to have sex with the daughter. And when planning the operation, "it was decided that showing up at the meet location was the substantial step." 3 VRP at 171-72.

2.    Testimony of Sergeant Graaff

Sergeant Joseph Graaff testified that he supervised the cyber-crimes unit of the Vancouver Police Department. He assisted in the investigation and arrest of Talbot. Graaff believed that if Talbot showed up to meet Ellie to plan on going to her apartment, it would be a substantial step. Graaff also testified that the State proposing a meeting first, and if the person was not 100% sure, they could walk away, could give the impression of an "out." 3 VRP at 206. Graaff later testified that considering the context of the entire chat, such language was not confusing at all and was a very small piece of the overall picture of meeting to have sex with a child once they went back to her home.

3.    Testimony of Investigator Holbrook

Investigator Holbrook testified that she assisted Detective Givens by being Ellie on the phone conversation with Talbot. The topic of the conversation was about sexual contact with a minor, but the agreement between Talbot and Ellie was to first meet and talk. Holbrook got the sense that Talbot was anxious to meet Ellie for the purpose of having contact with Ellie's daughter.

6

D.     VERDICT AND SENTENCING

The trial court concluded that Talbot was not guilty of attempted second degree child rape but guilty of attempted second degree child molestation.[4]  The trial court incorporated Talbot's communications with Ellie into its findings of fact.  The trial court determined:

> The Defendant took a substantial step toward the commission of the crime of Child Molestation in the Second Degree at approximately 4:00 p.m. on September 24, 2015, by driving to and entering into the Starbucks pursuant to an agreement to meet Ellie O'Reilly at that time and location.

CP at 142 (Conclusion of Law 2.2).

The trial court did not enter a conclusion of law regarding Talbot's intent to commit attempted second degree child molestation.  However, in its oral ruling, the trial court concluded that Talbot saying that he was going to go easy and slow to not harm the child, and that the sexual contact would involve touching, licking, and sucking, was evidence that sexual contact was to be had with the 12 to 13 year-old child.  The trial court also concluded that Talbot's references to him not wanting the child to be raw and sore was evidence that he intended to have sexual intercourse with the child.

The trial court sentenced Talbot to 11.25 months of total confinement, 12 months of community custody with a list of community custody conditions, $600 in mandatory legal financial obligations, and HIV testing.  As part of his community custody conditions, the trial court required Talbot to obtain a sexual deviancy evaluation, comply with any recommended treatment, and prohibited him from "possess[ing] any electronic device capable of accessing the internet without

---

[4] The trial court concluded that Talbot did not take a substantial step towards raping the child, and thus, he was not guilty of attempted second degree child rape.

7

prior approval of DOC and [his] sexual deviancy treatment provider" and from "access[ing] the internet without prior approval of [the] DOC and [his] sexual deviancy treatment provider." CP at 97.

Talbot appeals.

## ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

1.    Legal Principles

To sustain a conviction, the State must prove all the elements of an offense beyond a reasonable doubt. *In re Matter of Winship*, 397 U.S. 358, 363–64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). To determine if there is sufficient evidence to support a conviction, this court views the evidence in the light most favorable to the prosecution and determines whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A sufficiency challenge admits the truth of the State's evidence and all reasonable inferences drawn from it. *Id.* at 106. All such inferences "'must be drawn in favor of the State and interpreted most strongly against the defendant.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Circumstantial evidence and direct evidence are equally reliable. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

We review challenges to a trial court's conclusions of law de novo. *Homan*, 181 Wn.2d at 106. We defer to the fact finder on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague–Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007). If there is insufficient evidence to prove an element of a crime, reversal is required. *State v. Smith*, 155 Wn.2d 496, 505, 120 P.3d 559 (2005).

Under RCW 9A.44.086(1), a person is guilty of second degree child molestation "when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." A person is guilty of attempt of a crime if "with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1).

2.      Criminal Intent

Talbot argues that he was only contemplating having sexual contact with a 12-year-old girl and the evidence was insufficient to show that he had formed the intent to do so. We disagree.

The intent required for an attempt crime is the intent to accomplish the criminal result of the base crime. *State v. Johnson*, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). "We look to the definition of the base crime for the requisite criminal result." *Id*. For attempted second degree child molestation, the person must intend to have "sexual contact with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.086(1).

Here, the evidence shows that Talbot knew Ellie's daughter was 12 years old, and that Ellie was asking Talbot to have sexual contact with her daughter. Talbot confirmed with Ellie that "I will do this but I want to meet you first," in reference to having sex with Ellie's daughter. CP at 120. Talbot told Ellie, "Let her go [to soccer and] we can do this when she gets home." CP at 121. Talbot also told Ellie that he would not use a condom, but that he would be gradual with her daughter "so that active penetration doesn't wear her raw and make her sore," and that the first time would just be "sit and touch, talk and touch and ask questions and feel and explain things."

9

CP at 129-30. Talbot further stated that the "first time it would be sitting and talking and feeling and touching and exploring" and "a little, you know, little licking and sucking." CP at 137.

Viewing the evidence in the light most favorable to the State, and drawing all reasonable inferences in favor of the State, a rational fact finder could find beyond a reasonable doubt that Talbot intended to have sexual contact with Ellie's 12-year-old daughter. Therefore, we hold that sufficient evidence was presented to prove intent.

       3.      Substantial Step

Talbot argues that there was insufficient evidence to show he took a substantial step towards committing the crime. We disagree.

"A substantial step is an act that is 'strongly corroborative' of the actor's criminal purpose." *Id.* (quoting *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205 (2006)). Any slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the actor to commit the crime.[5] *State v. Sivins*, 138 Wn. App. 52, 64, 155 P.3d 982 (2007). "Mere preparation to commit a crime is not a substantial step." *State v. Townsend*, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). Whether an act constitutes a substantial step is a question of fact. *State v. Wilson*, 158 Wn. App. 305, 317, 242 P.3d 19 (2010).

Talbot argues that the evidence merely shows that he took a preparatory step towards committing the crime of attempted second degree child molestation that was still in the negotiation stage. In support, Talbot cites *State v. Grundy*, 76 Wn. App. 335, 886 P.2d 208 (1994).

---

[5] "Slight" is defined as "small of its kind or in amount" and "to a small degree." WEBSTER'S THIRD NEW INT'L DICTIONARY 2142 (1969).

In *Grundy*, an officer posed as a drug runner, approached the defendant, and asked him what he wanted. 76 Wn. App. at 336. In response, the defendant said he wanted cocaine. *Id*. The officer asked to see the money, but the defendant asked to see the drugs first. *Id*. The defendant was then arrested and charged with attempted possession of cocaine. *Id*. The court held that although the defendant's "words evidenced an intent to acquire possession of cocaine, they are insufficient, without more, to constitute the requisite overt act." *Id*. at 337. The court held that the "parties were still in the negotiation stage." *Id*. at 338.

In contrast here, Talbot's conduct involved more than mere words negotiating whether Talbot would have sexual contact with Ellie's daughter. Talbot confirmed he was willing to have sexual contact with Ellie's daughter, and he discussed with Ellie what acts he would do to Ellie's 12-year-old daughter. Talbot told Ellie that he would be "very slow and easy" with "a little, you know, licking and sucking" "so that active penetration doesn't wear her raw and make her sore." CP at 129, 137. Talbot and Ellie agreed to meet at the coffee shop, which was the first step in putting their plan for Talbot and Ellie's daughter to have sexual contact into action. Talbot then went to meet Ellie at the coffee shop. This conduct was more than just words.

Viewing the evidence in the light most favorable to the State, a rational finder of fact could find that Talbot went beyond the negotiation stage and took a step towards fulfilling his plan to have sexual contact with Ellie's 12-year-old daughter. Thus, we hold that sufficient evidence was presented to prove Talbot took a substantial step towards committing the crime of attempted second degree child molestation.

Talbot further argues that he did not engage in sexual conversations with a person he thought was a child, did not arrange to meet with a child, and did not bring anything showing his

intent to have sexual contact with a child. Talbot cites to *Townsend*,[6] *Sivins*,[7] and *Wilson*[8] to show that his conduct did not constitute a substantial step in committing the crime of attempted second degree child molestation.

In *Townsend*, a police detective posed online as a 13-year-old girl. 147 Wn.2d at 670-71. The defendant began e-mailing with the girl, exchanged sexual messages, and arranged to meet at a motel room to have sex. *Id.* at 671. The defendant went to the motel room at the agreed upon time, knocked on the door, and asked to see the girl. *Id.* The defendant was then arrested and convicted of attempted second degree rape of a child. *Id.* Our Supreme Court affirmed the conviction, concluding that the evidence was sufficient to show the defendant took a substantial step toward committing attempted second degree child rape. *Id.* at 680.

In *Sivins*, a police intern posed as a 13-year-old girl and had sexual discussions with the defendant on an online chat room. 138 Wn. App. at 56-57. The defendant said he wanted to meet the girl and would have sex with her, if she wanted. *Id.* at 64. After promising pizza and vodka, the defendant drove several hours and rented a motel room in the town where she lived. *Id.* The defendant was arrested in the room and convicted of attempted second degree child rape. *Id.* at 58. On appeal, the defendant argued that the evidence was insufficient to establish he took a substantial step toward committing the crime. *Id.* at 63-64. The court concluded that the

---

[6] 147 Wn.2d at 666.

[7] 138 Wn. App. at 52.

[8] 158 Wn. App. at 305.

defendant's internet communications were evidence of his intent and that his subsequent travel and motel rental were substantial steps that corroborated his intent. *Id*. at 64.

In *Wilson*, a police detective posed online as a 38-year-old mother with a 13-year-old daughter that would "fulfill your fantasies but it won't be cheap." 158 Wn. App. at 308. The defendant e-mailed the mother saying he was interested and arranged with her to meet the daughter and then go back to their home to have sex for $300. *Id*. at 309. The defendant went to the meeting location with $330. *Id*. at 311. The defendant was then arrested and convicted of attempted second degree child rape. *Id*. at 311-12. On appeal, the court held that negotiations had concluded and that the defendant's exchanging of photographs with the mother, obtaining her address, and driving to the agreed location with the money he agreed to pay for sex constituted a substantial step. *Id*. at 318. Thus, the court affirmed the conviction. *Id*. at 320.

Talbot argues that his case differs from *Townsend*, *Sivins*, and *Wilson* because he still had to meet with Ellie before having sexual contact with her daughter. But the meeting was only to get comfortable with each other. The plan for what Talbot was going to do with Ellie's daughter was already set–Talbot was to have sexual contact with Ellie's daughter. Meeting at the coffee shop was the first step towards fulfilling that plan.

Any slight act done in furtherance of the crime constitutes an attempt if it clearly shows the design of the actor to commit the crime. *Sivins*, 138 Wn. App. at 64. Here, the design of committing second degree child molestation was to meet with Ellie and then go back to her home so that Talbot could have sexual contact with Ellie's 12-year-old daughter. Talbot appearing at the coffee shop was the slight act done in furtherance of his design to have sexual contact with Ellie's 12-year-old daughter.

Talbot had the intent to commit second degree child molestation and took a substantial step towards doing so. Therefore, we hold that sufficient evidence was presented to prove Talbot committed attempted second degree child molestation.

B. COMMUNITY CUSTODY CONDITIONS

Talbot argues that the sentencing court's conditions prohibiting him from (1) possessing any electronic device capable of accessing the internet without prior approval of the Department of Corrections (DOC) and his sexual deviancy treatment provider and (2) accessing the internet without prior approval of the DOC and his sexual deviancy treatment provider were not authorized by law and in violation of his constitutional rights. We disagree.

1. Conditions Authorized by Law

A sentencing court lacks authority to impose a community custody condition unless the legislature has authorized it. *State v. Kolesnik*, 146 Wn. App. 790, 806, 192 P.3d 937 (2008), *review denied*, 165 Wn.2d 1050 (2009). Any condition imposed in excess of a court's statutory authority is void. *State v. Johnson*, 180 Wn. App. 318, 325, 327 P.3d 704 (2014). We review de novo whether the sentencing court had statutory authorization to impose a community custody condition. *Id*. If the sentencing court had statutory authorization, we review its decision to do so for an abuse of discretion. *Id*. at 326.

Under RCW 9.94A.701(3)(a), the sentencing court must sentence an offender to community custody for one year when convicted of a crime against persons. When an offender is sentenced to community custody, the court may order the offender to comply with any crime-related prohibitions. RCW 9.94A.703(3)(f). And when a person is convicted of a felony, the

sentencing court may also impose and enforce crime-related prohibitions and affirmative conditions. RCW 9.94A.505(9).

A crime-related prohibition is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). "'Directly related' includes conditions that are 'reasonably related' to the crime." *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015) (quoting *State v. Kinzle*, 181 Wn. App. 774, 785, 326 P.3d 870, *review denied,* 181 Wn.2d 1019 (2014)).

Attempted second degree child molestation is a crime against persons and a class C felony. RCW 9.94A.411(2)(a); RCW 9A.28.020(3)(c); RCW 9A.44.086(2).

Talbot argues that a "total ban on Internet use and devices used to access the Internet are not crime related because the ban includes lawful use of the Internet" to express opinions, make purchases, and communicate with family and friends. Br. of Appellant at 30. However, Talbot fails to provide any legal authority or support for this claim.

Talbot was convicted of attempted second degree child molestation, which is a crime against persons and a class C felony. As a result, he was placed on community custody and the sentencing court had authority to impose crime-related prohibitions.

Here, Talbot used the internet to access Ellie's online ad. Talbot also used the internet to respond to Ellie's online ad and to communicate with Ellie. The online ad and subsequent communications primarily focused on arranging for Talbot to have sexual contact with Ellie's 12-year-old daughter. Thus, the sentencing court's challenged community custody conditions were reasonably, if not directly, related to the circumstances of the crime because Talbot used the internet in the commission of the crime.

The trial court did not abuse its discretion in imposing the challenged community custody conditions. *See State v. Magana*, 197 Wn. App. 189, 201, 389 P.3d 654 (2016) (holding that because the defendant used social media to contact the victim of a third degree rape, conditions restricting internet access and social media sites were permissible). Therefore, we hold that the conditions were authorized crime-related prohibitions.

2.      Conditions Constitutional

Talbot further argues that the sentencing court's prohibition against accessing the internet without approval from the DOC and his sexual deviancy treatment provider violates his First Amendment rights and is overbroad. We disagree.

Generally, imposing community custody conditions is within the discretion of the sentencing court and will be reversed if manifestly unreasonable. *State v. Valencia*, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010). The imposition of an unconstitutional condition is manifestly unreasonable. *Id.* at 792.

a.      First Amendment

A defendant's constitutional rights while on community custody are subject to the infringements authorized by the Sentencing Reform Act of 1981 (SRA), codified in chapter 9.94A RCW. *State v. Riles*, 135 Wn.2d 326, 347, 957 P.2d 655 (1998). Under the SRA, a sentencing court may require a defendant to comply with crime-related prohibitions. RCW 9.94A.505(9), .703(3)(f). And a sentencing condition may prohibit a defendant's access to a means or medium through which he committed a crime. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 380, 229 P.3d 686 (2010). But a condition restricting a defendant's First Amendment rights must be

16

reasonably necessary to accomplish the essential needs of the state and public order, and be sensitively imposed. *State v. Bahl*, 164 Wn.2d 739, 757, 193 P.3d 678 (2008).

Here, the condition prohibiting access to the internet without approval by the DOC or Talbot's sexual deviancy treatment provider was reasonably necessary to accomplish the essential needs of the State and public order, and was sensitively imposed. Talbot's crime was committed through use of the internet where he found an ad for and later arranged to have sexual contact with a 12-year-old girl. Prohibiting him from access to the internet—where such ads exist and more arrangements could be made—is therefore reasonably necessary to prevent repeated offenses. Thus, protecting the needs of the state and public order. Moreover, the condition did not impose a blanket prohibition; Talbot could access the internet with permission from the DOC and his treatment provider, two parties who are charged with assisting Talbot in becoming a lawful citizen. Hence, the condition was sensitively imposed. Therefore, we hold that the sentencing court's condition did not improperly infringe on Talbot's First Amendment rights.

3.    Constitutionally Overbroad

When considering whether a community custody condition is overbroad, courts focus on whether the condition is crime-related. *See State v. McKee*, 141 Wn. App. 22, 37, 167 P.3d 575 (2007) ("[A]n offender's constitutional rights during community placement are subject to SRA-authorized infringements, including crime-related prohibitions."), *review denied*, 163 Wn.2d 1049 (2008); *see also Magana*, 197 Wn. App. at 201. Here, as discussed above, the condition prohibiting internet access is crime-related. *See* Section B.1. Therefore, we hold that Talbot's claim fails.

17

No. 49381-1-II

APPELLATE COSTS

Talbot argues that we should decline to impose appellate costs against him due to his indigency. The State confirms that it does not intend to seek a cost bill in this case. Therefore, we waive appellate costs.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Sutton, J.